**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| LINDA KELSCH, | ) | NO. CV 14-532-E |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | **AND ORDER OF REMAND** |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

 Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS HEREBY ORDERED that Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.

**PROCEEDINGS**

 Plaintiff filed a Complaint on January 23, 2014, seeking review of the Commissioner's denial of social security disability benefits. The parties filed a consent to proceed before a United States Magistrate Judge on August 8, 2014.

Plaintiff filed a motion for summary judgment on July 9, 2014. Defendant filed a motion for summary judgment on August 8, 2014. The Court has taken both motions under submission without oral argument. See L.R. 7-15; "Order," filed January 27, 2014.

## BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

Plaintiff asserts disability since July 24, 2009, based primarily on alleged mental problems (Administrative Record ("A.R.") 83, 151, 154). An Administrative Law Judge ("ALJ") examined the medical record and heard testimony from Plaintiff and a vocational expert (A.R. 24-35, 47-75). The ALJ found Plaintiff has severe "major depressive disorder and panic disorder," but retains the residual functional capacity to perform work at all exertion levels with certain nonexertional limitations (A.R. 26-33).[1]  In reliance on the vocational expert's testimony, the ALJ found Plaintiff can perform work as a packager and linen room attendant (A.R. 34-35; see also A.R. 66-67 (vocational expert testimony)).  The Appeals Council denied

---

[1]     The ALJ found Plaintiff can:

perform simple, routine tasks with simple instructions;
perform work involving simple decision-making; never
remember or carry out detailed tasks or instructions;
tolerate occasional changes in routine; work in a low
stress environment defined as no fast paced-high volume
type work;* with frequent interaction with supervisors,
coworkers and the general public.

(A.R. 28).  *The Court observes that the semi-colon appears to have been placed in error.  The vocational expert testified that a person with these limitations could not perform Plaintiff's past relevant work because that work required frequent contact with the general public.  See A.R. 67.

1   review (A.R. 1-3).

2

3                        **STANDARD OF REVIEW**

4

5       Under 42 U.S.C. section 405(g), this Court reviews the

6   Administration's decision to determine if: (1) the Administration's

7   findings are supported by substantial evidence; and (2) the

8   Administration used correct legal standards.  See <u>Carmickle v.</u>

9   <u>Commissioner</u>, 533 F.3d 1155, 1159 (9th Cir. 2008); <u>Hoopai v. Astrue</u>,

10  499 F.3d 1071, 1074 (9th Cir. 2007); <u>see also</u> <u>Brewes v. Commissioner</u>

11  <u>of Social Sec. Admin.</u>, 682 F.3d 1157, 1161 (9th Cir. 2012).

12  Substantial evidence is "such relevant evidence as a reasonable mind

13  might accept as adequate to support a conclusion."  <u>Richardson v.</u>

14  <u>Perales</u>, 402 U.S. 389, 401 (1971) (citation and quotations omitted);

15  <u>see also</u> <u>Widmark v. Barnhart</u>, 454 F.3d 1063, 1067 (9th Cir. 2006).

16

17                           **DISCUSSION**

18

19  **I.    Evidence Regarding Plaintiff's Alleged Mental Impairments.**

20

21      The extensive evidence regarding Plaintiff's alleged mental

22  impairments is partially in conflict with certain findings made by the

23  ALJ.  Therefore, the Court summarizes this evidence in some detail.

24

25      Plaintiff took a stress leave from her job on July 24, 2009 (the

26  alleged onset date) (A.R. 216-17).  The first treatment note for

27  anxiety at work is dated April 9, 2009, with symptoms reportedly

28  "longstanding" (A.R. 240-41).  Plaintiff's doctor diagnosed anxiety

                                  3

disorder, prescribed Alprazolam (Xanax), and gave Plaintiff contact information for psychiatry and health education because Plaintiff was "less inclined" to take medication (A.R. 241).[2]  Plaintiff's blood pressure was elevated due to stress (A.R. 241).

Plaintiff returned to her doctor on April 23, 2009, claiming increased anxiety due to work stress but she reportedly did not appear anxious or depressed (A.R. 245).  Plaintiff assertedly did not want medications or psychotherapy (A.R. 245).  Given Plaintiff's reluctance to take medications, Plaintiff's doctor recommended acupuncture (A.R. 245).

Plaintiff next complained of work related stress on July 23, 2009 (A.R. 248).  She reportedly appeared anxious, exhibited a depressed mood and was diagnosed with an acute stress reaction (A.R. 248). Plaintiff again assertedly did not want any medications (A.R. 248). Plaintiff's primary doctor ordered Plaintiff off work until she could be seen by a psychiatrist (A.R. 248).

A marriage and family therapist examined Plaintiff on July 30, 2009 (A.R. 249-52).  Plaintiff complained that she could not control herself at work, feels ill, cries, cannot concentrate or function, and

---

[2]     Plaintiff reportedly had been prescribed psychotropic medication in 1985, which she discontinued after one or two doses due to a "horrible" headache (A.R. 555).  Plaintiff also was prescribed Ativan as needed in January of 1998 for stress and anxiety (A.R. 548).  Plaintiff refused to take Xanax when it was recommended in April of 2009 (A.R. 250, 550).  As of January 5, 2011, Plaintiff reportedly had never used any psychotropic medications except as noted herein (A.R. 555).

gets confused due to her workload (A.R. 250).  Plaintiff had not taken the Xanax she was prescribed in April, saying she had bad reactions to medications in the past (A.R. 250).  Plaintiff's mood reportedly was depressed and her memory and concentration assertedly were poor (A.R. 251).  The therapist diagnosed Adjustment Disorder with Depression and Anxiety, Occupational Issues, and assigned a Global Assessment of Functioning ("GAF") score of 55, which denotes moderate problems (A.R. 252).[3]

Psychologist Michelle Levin evaluated Plaintiff twice in September of 2009 (A.R. 216-22).  Dr. Levin believed that workplace factors, namely Plaintiff's relationship with her manager and increased workload, triggered Plaintiff's diagnosed condition (Major Depressive Disorder, Single Episode, Severe without Psychotic Features, and Generalized Anxiety Disorder) (A.R. 221).  Dr. Levin recommended that Plaintiff attend individual psychotherapy, see a psychiatrist to explain medication options, and be re-evaluated in six months (A.R. 221).

Psychologist April Pavlik prepared a follow up report dated December 23, 2009 (A.R. 223-25).  Dr. Pavlik found Plaintiff still moderately depressed and indicated Plaintiff should continue

---

[3]    Clinicians use the GAF scale to rate "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. TR 2000) ("DSM").  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  Id.

individual therapy and remain off work until February 11, 2010 (A.R. 225).[4]

Psychologists Barry Halote and Allan Gerson reviewed the available record and prepared a "Permanent and Stationary Evaluation Report" dated July 12, 2010 (A.R. 282-305; see also A.R. 306-17 (initial report)).  Drs. Halote and Gerson evaluated Plaintiff on February 16, 2010, and again on June 1, 2010 (A.R. 282-83; see also A.R 398-427 (initial evaluation)).[5]  They found Plaintiff incapable of returning to her usual and customary job duties based on cumulative stress from the workplace (A.R. 283, 296-300, 303-05).  Reportedly, Plaintiff had been treated individually by Dr. Swanson, and had stated

///
///
///
///
///

---

[4]    Plaintiff reported that she met with Dr. Levin for weekly psychotherapy sessions from September 2009 through the time she started meeting with Dr. Pavlik (A.R. 544, 552). Plaintiff then met with Dr. Pavlik weekly until December 2009, when insurance stopped paying for the visits (A.R. 544).  There are no treatment notes in the medical record for these therapy sessions.

[5]    Dr. Halote also prepared a summary of the medical record as of January 20, 2011 (A.R. 440-59).  Plaintiff first complained of carpal tunnel syndrome on the left hand in June 2001 (A.R. 447).  She first reported headaches and dizziness from work-related stress in April 2009 (A.R. 454).  Based on his review of the medical evidence, Dr. Halote found no reason to change his opinion that Plaintiff was unable to return to her past work (A.R. 458 (deferring judgment on non-psychological issues)).

1   that overall she was feeling better (A.R. 284, 296-97).[6]  Plaintiff

2   reported work-related anxiety and depression, as well as headaches,

3   nausea, dizziness, loss of balance and, while at work, muscle tension

4   and pain in her neck and shoulders, excessive sweating, weakness,

5   shortness of breath, rapid heartbeat and chest pain (A.R. 285, 287,

6   298, 300).

7

8        On examination, no memory or concentration problems reportedly

9   were evident, nor signs of significant cognitive impairment observed

10  (A.R. 291).  Psychological testing indicated, inter alia, that

11  Plaintiff was depressed (mild levels), withdrawn, fearful, and mildly

12  anxious (moderate, subjectively) (A.R. 292-95).  Test results

13  assertedly revealed the presence of depression, anxiety, loss of self-

14  confidence, social isolation, anger, and difficulties with

15  concentration (A.R. 295-96).

16

17       Drs. Halote and Gerson diagnosed Plaintiff with Major Depressive

18  Disorder, Single Episode, Improved, and Panic Disorder without

19  ///

20  ///

21  ///

22  ///

23  ///

24  ───────────────────────

25       [6]   At the time of their initial evaluation in February of
    2010, Drs. Halote and Gerson said that prompt treatment was
26  "deemed necessary" to mitigate Plaintiff's symptoms (A.R. 283).
    They had referred Plaintiff to Dr. Swanson for therapy in an
27  individual setting and said Plaintiff had been treating with Dr.
    Swanson at the time of the second interview in June of 2010 (A.R.
28  283-84).

7

Agoraphobia, with a GAF score of 64 (A.R. 301).[7]  They concluded that
Plaintiff was unable to return to her former work, and also should be
restricted from working in high stress situations (A.R. 305).

Treating psychologist Frank Swanson prepared a Psychological
Evaluation dated September 30, 2010 (A.R. 370-73).  Dr. Swanson
indicated he first had examined Plaintiff on March 4, 2010, and most
recently had examined her on September 15, 2010 (A.R. 373; but see
A.R. 296 (referencing "Treatment and Progress Notes" from Dr. Swanson,
"dated February 24, 2010" and "dated April 21, 2010")).[8]  Plaintiff
reportedly appeared to have fear, anxiety, distress, tearful behavior,
psychomotor agitation, and accelerated speech (A.R. 370).  Dr. Swanson
reportedly had observed a depressed mood and anxiety during therapy
(A.R. 372).  "Several test instruments were used to ascertain
[Plaintiff's] psychological functioning" (A.R. 371).  Dr. Swanson
thereby "determined" Plaintiff's helplessness, loss of motivation,
loss of energy, loss of interest, sadness, intense fear, sleep

---

[7]    A GAF score of 61-70 indicates "[s]ome mild symptoms
(e.g., depressed mood and mild insomnia) or some difficulty in
social, occupational, or school functioning (e.g., occasional
truancy, or theft within the household) but generally functioning
pretty well, has some meaningful interpersonal relationships."
DSM, p. 34.

[8]    As of January 5, 2011, Plaintiff reported that she had
met with Dr. Swanson for weekly therapy for approximately three
months (i.e., from February through April 2010), then tapered off
to seeing Dr. Swanson once every three to four weeks (A.R. 544).
There are no treatment notes in the medical record for any of
these therapy sessions.  It is not clear when Plaintiff may have
stopped consulting Dr. Swanson.  As reflected in the above
discussion, the existing record references at least four specific
dates on which Plaintiff was seen by Dr. Swanson, but suggests
that many more than four therapy sessions with Dr. Swanson
actually occurred.

disturbance, and increased irritability (A.R. 371).  Dr. Swanson
indicated that Plaintiff had diminished intellectual functioning, and
that sleep deprivation and chronic physical pain, as well as
ambivalence and loss of independence, self-value, and self-identity,
had contributed to cognitive dysfunction (i.e., decreased
concentration, attention, and memory) (A.R. 371-72).  Plaintiff's
social functions assertedly had improved with increased "out-door
behavior," but her work functions "remained tentative" (A.R. 373).
Dr. Swanson diagnosed Plaintiff with Panic Anxiety Disorder
(Provisional Agoraphobia), Major Depressive Disorder, and Primary
Insomnia (Provisional), assigning a present GAF score of 58 to 62, and
48 to 52 for the past year, with a guarded prognosis (A.R. 373).  Dr.
Swanson concluded, "[i]t is unlikely that [Plaintiff] will be able to
perform work activities at this time" (A.R. 372).

     On September 6, 2011, Dr. Swanson completed a form entitled
"Medical Statement Concerning Depression and Anxiety, OCD, PTSD or
Panic Disorder for Social Security Disability Claim" (A.R. 377-79).
Dr. Swanson identified essentially the same symptoms discussed in his
earlier evaluation, and indicated that Plaintiff would have "moderate"
restriction of activities of daily living and "marked" difficulty
maintaining social functioning (A.R. 377).  He also indicated the
presence of deficiencies of concentration, persistence, or pace, and
repeated episodes of decompensation in work-like settings (A.R. 377).
Dr. Swanson further indicated that Plaintiff would have work-related
psychiatric limitations ranging from "moderate" to "marked" to
"extremely" impaired (A.R. 378-79).  The only ability that reportedly
was "not significantly impaired" was the ability to ask simple

1  questions or request assistance (A.R. 378-79).  Dr. Swanson left blank

2  the "Comments" section of the form (A.R. 379).

3

4      Psychiatrist David Sones reviewed the medical record (absent Dr.

5  Swanson's September 6, 2011 evaluation) and prepared an Agreed Medical

6  Examination in Psychiatry report dated January 5, 2011, for

7  Plaintiff's workers compensation claim (A.R. 538-86; see also A.R.

8  588-655 (Dr. Sones' interview notes)).  Plaintiff reported her current

9  psychological stress level as 1 out of 10, with 10 being the level of

10  stress she experienced when she last worked (A.R. 545).  Plaintiff

11  reported suffering from anxiety and depression approximately two times

12  per week for periods from five minutes to five hours when she worries

13  about work or her financial situation, interrupted sleep two to three

14  nights per week, but no disturbance in her social functioning (A.R.

15  557-59).  Plaintiff reportedly enjoyed interacting with family and

16  friends and was not socially withdrawn (A.R. 559).  Mental status

17  examination noted no unusual findings other than an affect reflecting

18  apprehension and frustration, a predominantly dysphoric mood, with

19  periods in which Plaintiff became acutely anxious with trembling and

20  an increased respiration rate, and "somewhat limited" judgment and

21  insight (A.R. 562-64, 579).  Dr. Sones gave Plaintiff a battery of

22  tests and diagnosed Plaintiff with Adjustment Disorder with Mixed

23  Anxiety and Depressed Mood, Chronic, and assigned a GAF score in the

24  range of 51-60 (A.R. 564-76, 579-80, 584).  Dr. Sones opined that

25  Plaintiff's psychiatric condition would not change within the next

26  twelve months (A.R. 582).  Dr. Sones recommended that Plaintiff

27  receive up to eight sessions per year of psychotherapy on an as-needed

28  basis (A.R. 583).  Dr. Sones opined that "[f]rom a psychiatric

standpoint the applicant is capable of resuming her usual and customary work duties as a commercial lines account manager for [her employer] without the need for any modifications" (A.R. 584).

Psychiatrist Allen Chroman prepared a Psychiatric Consultation dated May 8, 2011 (A.R. 391-93). Plaintiff reportedly exhibited signs of anxiety, euthymic mood, blunted affect, but a grossly intact memory, fund of knowledge, and the ability to abstract spontaneously and appropriately (A.R. 391-92). Plaintiff reported that at times she has difficulty going outside her house (A.R. 391). Dr. Chroman diagnosed Plaintiff with Panic Disorder and assigned a current GAF score of 55 (A.R. 392). He prescribed Lexapro and Ativan (A.R. 392-93). Plaintiff reported that recently she was unable to have lunch in a restaurant and fled, secondary to panic (A.R. 396). On July 12, 2011, Plaintiff reported only modest improvement with respect to her panic attacks (A.R. 397). Dr. Chroman prescribed a trial of BuSpar (A.R 397).

Consultative psychological examiner Curtis Edwards reviewed a portion of the medical records and prepared a Psychological Evaluation dated November 17, 2011, and an accompanying Medical Source Statement of Ability to do Work-Related Activities (Mental) (A.R. 380-89). Plaintiff reportedly complained of panic, anxiety, fear, fear of leaving the house, sleep difficulties, difficulty dealing with people, confusion and disorientation (wherein she feels dizzy, has difficulty breathing, a rapid heartbeat, and a feeling that she may die) that has caused her to get lost when she leaves home, and to lose interest in her life (A.R. 381). Plaintiff reported that her psychiatric symptoms

caused impairments in all areas of daily living, in that she could complete activities but lacked motivation and energy to initiate tasks (A.R. 381, 383).  She also reported social isolation with few friendships (A.R. 381).  Plaintiff claimed to have engaged in psychotherapy for over two years with some benefit, but did not take any prescribed medications (A.R. 382).

Upon testing, Dr. Edwards opined that Plaintiff's attention and concentration were adequate for basic tasks that required less sustained concentration, she had deficits in several memory functions, difficulty identifying abstract problems, and "clear" discrepancies in her cognitive functioning with deficits in auditory/verbal processing, as well as working and delayed memory functioning (A.R. 383-85).  Dr. Edwards further opined that Plaintiff's performance on measures of intellectual functioning was suppressed as a result of other factors, such as pain and depressed mood (A.R. 384-85).  Dr. Edwards diagnosed Plaintiff with Panic Disorder without Agoraphobia and Major Depressive Disorder, Recurrent, Moderate (A.R. 386).  Dr. Edwards believed that Plaintiff could function appropriately in most situations, but that Plaintiff's condition likely would interfere with sustained activity in more demanding situations (A.R. 385).  He ultimately opined that Plaintiff would have moderate limitation: (1) understanding, remembering, and carrying out complex job instructions; (2) maintaining attention, concentration, persistence, and pace; (3) maintaining regular work attendance and performing work activities on a consistent basis; (4) making judgments on complex work-related decisions; and (5) responding appropriately to usual work situations and to changes in a routine work setting (A.R. 386-88).  According to

Dr. Edwards, Plaintiff would have mild limitations relating to supervisors, coworkers, and the public, and accepting instructions from supervisors (A.R. 386, 388). Dr. Edwards opined that Plaintiff would have no limitation in performing work activities without special or additional supervision for simple job instructions, and no limitations understanding, remembering, and carrying out simple instructions (A.R. 386-87). Dr. Edwards did not opine concerning Plaintiff's social functioning.

A CT study of Plaintiff's head from June 7, 2011 (which predated Dr. Edwards' evaluation but was not part of his record review), suggested mild volume loss, nonspecific mild periventricular white matter hypodensities which may represent chronic microvascular ischemic process, and bilateral basal ganglia hypodensities where "[d]ifferential includes prominent perivascular space versus lacunes" (A.R. 375-76).

On February 8, 2012, Plaintiff presented with complaints of confusion (A.R. 724-28). A MRI of Plaintiff's brain from March 10, 2012, showed nonspecific bilateral periventricular white matter signal changes, mild volume loss, and bilateral paranasal sinus disease (A.R. 657). Plaintiff's doctors described her condition as entailing "cerebrovascular disease" (i.e., a disease of the blood vessels that supply the brain, usually caused by atherosclerosis which can lead to stroke) (A.R. 667). See Definition of Cerebrovascular Disease (available online at http://www.medterms.com/script/main/ art.asp?articlekey=40116 (last visited Sept. 16, 2014). A March 15, 2012 treatment note from Neurologist Yuri Bronstein assessed Plaintiff

with memory loss, but stated that her cognitive testing was within the "broad spectrum of normal" (A.R. 695; see also A.R. 713-19 (treatment note from February 22, 2012, stating that Plaintiff also complained of vertigo and dizziness and ordering MRI study); A.R. 722 (March 8, 2012 normal EEG study)). Dr. Bronstein recommended testing for multiple sclerosis and signs of inflammation or infection, and referred Plaintiff to neurology for a second opinion (A.R. 695).

Dr. Roopa Bhat performed a neurological consultation on March 30, 2012 (A.R. 668-72). Plaintiff complained of confusion and difficulty with recall, as well as vertigo since November 2011 (A.R. 668). Regarding Plaintiff's reported memory and concentration difficulties, Dr. Bhat believed that Plaintiff's mental status examination was normal, but could not rule out contribution of insomnia and anxiety disorder (A.R. 672). Dr. Bhat suggested neuropsychological testing (A.R. 672). Dr. Bhat also recommended further testing to evaluate Plaintiff for multiple sclerosis (A.R. 672).

**II.  The ALJ Erred in the Evaluation of the Treating Psychologist's Opinion.**

Plaintiff argues, inter alia, that in determining her residual functional capacity, the ALJ improperly rejected the opinions of Plaintiff's treating psychologist, Dr. Swanson. See Plaintiff's Motion, pp. 5-7. The ALJ rejected Dr. Swanson's opinions based on: (1) the ALJ's belief that Dr. Swanson's "treatment history was quite brief . . . that [Plaintiff] initiated treatment with Dr. Swanson in March 2010 and was seen only two times"; (2) the ALJ's belief that Dr.

Swanson's opinions were not "formed" until one year after Dr. Swanson

stopped treating Plaintiff; (3) the alleged inconsistency between Dr.

Swanson's opinions and Plaintiff's reported daily activities; and

(4) the asserted lack of objective support for Dr. Swanson's opinions

(A.R. 33).

A treating physician's conclusions "must be given substantial

weight." Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988); see

Rodriguez v. Bowen, 876 F.2d 759, 762 (9th Cir. 1989) ("the ALJ must

give sufficient weight to the subjective aspects of a doctor's

opinion. . . . This is especially true when the opinion is that of a

treating physician") (citation omitted); see also Orn v. Astrue, 495

F.3d 625, 631-33 (9th Cir. 2007) (discussing deference owed to

treating physician opinions). Even where the treating physician's

opinions are contradicted,[9] as here, "if the ALJ wishes to disregard

the opinion[s] of the treating physician he . . . must make findings

setting forth specific, legitimate reasons for doing so that are based

on substantial evidence in the record." Winans v. Bowen, 853 F.2d

643, 647 (9th Cir. 1987) (citation, quotations and brackets omitted);

see Rodriguez v. Bowen, 876 F.2d at 762 ("The ALJ may disregard the

treating physician's opinion, but only by setting forth specific,

legitimate reasons for doing so, and this decision must itself be

based on substantial evidence") (citation and quotations omitted).

///

---

[9]     Rejection of an uncontradicted opinion of a treating
physician requires a statement of "clear and convincing" reasons.
Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Gallant v.
Heckler, 753 F.2d 1450, 1454 (9th Cir. 1984).

1    An ALJ may discount treating physician opinions that are not
2    adequately supported by clinical findings and objective medical
3    evidence.  See Batson v. Commissioner, 359 F.3d 1190, 1195 (9th Cir.
4    2004); Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003); Matney
5    v. Sullivan, 981 F.2d 1016, 1019-20 (9th Cir. 1992).  A limited
6    treatment history is a proper consideration.  See Benton v. Barnhart,
7    331 F.3d 1030, 1038-39 (9th Cir. 2003) (duration of the treatment
8    relationship and the frequency and nature of the contact deemed
9    relevant in weighing medical opinion evidence); 20 C.F.R. §
10   404.1527(c)(2) (factors to consider in weighing treating source
11   opinion include the nature and length of treatment relationship, the
12   frequency of examination, the supportability of the opinions by
13   medical signs and laboratory findings, and the opinion's consistency
14   with the record as a whole).

15

16   In the present case, the ALJ rejected Dr. Swanson's opinions
17   based in part on the ALJ's characterization of Plaintiff's treatment
18   history as "quite brief" and as having involved Plaintiff seeing Dr.
19   Swanson "only two times" (A.R. 33).  The ALJ thereby mischaracterized
20   the record.  An ALJ's material mischaracterization of the record can
21   warrant remand.  See, e.g., Regennitter v. Commissioner, 166 F.3d
22   1294, 1297 (9th Cir. 1999).  As detailed above, the record reflects
23   that Dr. Swanson saw Plaintiff on at least four different, specific
24   dates.  The record also contains other indications of significant
25   treatment by Dr. Swanson over a considerable period of time.  For
26   months, Plaintiff reportedly saw Dr. Swanson "weekly," and thereafter
27   tapered off to "approximately once every three to four weeks" (A.R.
28   544).  Drs. Halote and Gerson, whose observations also suggested that

16

1  Plaintiff had a more significant treatment history with Dr. Swanson
2  than the ALJ found to exist, evidently saw treatment notes from Dr.
3  Swanson that are not a part of the administrative record.  It is
4  unclear why Dr. Swanson's treatment notes were not made a part of the
5  record.  The record also seems to be devoid of the type of written
6  requests the Administration often sends to treating providers in order
7  to obtain medical records.

8

9       "The ALJ has a special duty to fully and fairly develop the
10  record and to assure that the claimant's interests are considered.
11  This duty exists even when the claimant is represented by counsel."
12  Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983); accord Garcia v.
13  Commissioner, 2014 WL 4694798, at *4 (9th Cir. Sept. 23, 2014); see
14  also Sims v. Apfel, 530 U.S. 103, 110-11 (2000) ("Social Security
15  proceedings are inquisitorial rather than adversarial.  It is the
16  ALJ's duty to investigate the facts and develop the arguments both for
17  and against granting benefits. . . ."); Widmark v. Barnhart, 454 F.3d
18  1063, 1068 (9th Cir. 2006) (while it is a claimant's duty to provide
19  the evidence to be used in making a residual functional capacity
20  determination, "the ALJ should not be a mere umpire during disability
21  proceedings") (citations and internal quotations omitted); Smolen v.
22  Chater, 80 F.3d at 1288 ("If the ALJ thought he needed to know the
23  basis of Dr. Hoeflich's opinions in order to evaluate them, he had a
24  duty to conduct an appropriate inquiry, for example, by subpoenaing
25  the physicians or submitting further questions to them.  He could also
26  have continued the hearing to augment the record.") (citations
27  omitted).  An ALJ's duty to develop the record is "especially
28  important" "in cases of mental impairments."  DeLorme v. Sullivan, 924

1  F.2d 841, 849 (9th Cir. 1991).

2

3      As mentioned above, in rejecting Dr. Swanson's opinions, the ALJ

4  relied in part on the supposedly limited treatment history (which the

5  ALJ mischaracterized) and an assumed lack of objective evidence

6  supporting Dr. Swanson's opinions.  The ALJ should not have done so

7  without first attempting to develop the record fully regarding

8  Plaintiff's treatment history with Dr. Swanson and the bases for Dr.

9  Swanson's opinions.  See, e.g., Montgomery v. Astrue, 2012 WL 4848731,

10  at *5 (C.D. Cal. Oct. 11, 2012) ("It is unjust to fail to fully

11  develop the record regarding these treatment notes and then rely on

12  the lack of supporting treatment notes to reject the opinions of the

13  treating sources.").

14

15      The ALJ also relied in part on an asserted inconsistency between

16  Plaintiff's reported daily activities and Dr. Swanson's opinions that

17  Plaintiff would be moderately to markedly restricted in her daily

18  activities and social functioning.  See A.R. 33.  A material

19  inconsistency between a treating physician's opinion and a claimant's

20  admitted level of daily activities can furnish a specific, legitimate

21  reason for rejecting the treating physician's opinion.  See, e.g.,

22  Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001).  However, the

23  only time Dr. Swanson opined regarding Plaintiff's specific work

24  related limitations was on September 6, 2011,[10] following Plaintiff's

25  report of having experienced difficulties leaving her house beginning

26  in September of 2010.  See A.R. 373, 391, 396 (Plaintiff's reported

27  ────────────

28      [10]   The record is uncertain regarding precisely when Dr.
   Swanson formed the opinions he expressed on September 6, 2011.

difficulties); see also A.R. 381 (Plaintiff's November 17, 2011 report
to Dr. Edwards of impairment in activities of daily living).


        The function reports on which the ALJ apparently relied as
assertedly inconsistent with Dr. Swanson's opinions significantly
predate those opinions.  In a function report dated August 4, 2010
(more than a year before the expression of Dr. Swanson's opinions),
Plaintiff's husband reported that Plaintiff went outside daily, drove,
did the shopping, helped with cleaning, paid bills, played with and
helped feed the pets and took them to the veterinarian, used the
internet, watched television, read, and had no problem with her
personal care (A.R. 173-74, 176-77).  Plaintiff's husband reportedly
prepared all the meals eaten at home (A.R. 175).  He said Plaintiff
was able to go to lunch or dinner with friends "from time to time"
(A.R. 177).  Plaintiff's husband then knew of no changes in
Plaintiff's social activities since her condition began (A.R. 178).
He stated at that time that she got along "fine" with authority
figures (including bosses) (A.R. 179).


        In a document dated August 1, 2010, Plaintiff herself similarly
reported that she was able to care for her personal needs, and that
she watched television, used a computer to read and do research and
played interactive games, fed, exercised and played with her animals,
ran errands, occasionally ate lunch with friends, visited friends in
person, via telephone and via computer daily, made phone calls, filled
out paperwork, did light cleaning and laundry, and a few household
repairs (A.R. 181-83, 185).  Plaintiff then indicated she did not have
any problems getting along with others and got along "very well" with

1  authority figures (including bosses) (A.R. 186-87).

2

3      Plaintiff reported to the Agreed Medical Examiner on January 5,
4  2011, that her husband had taken responsibility for most household
5  chores (A.R. 547).  She then estimated spending only an hour per month
6  doing chores, but up to six hours per day using a computer and
7  watching television (A.R. 547).  Plaintiff then reportedly could
8  attend to her activities of daily living and could drive without
9  assistance (A.R. 547).  In a face to face interview on January 19,
10  2011, Plaintiff was observed to have trouble talking and answering
11  questions and was described as "very jittery and nervous" and crying
12  (A.R. 190-91).  Yet, at approximately the same time, Plaintiff
13  evidently did not report to an agreed medical examiner "any
14  disturbance in her social functioning" (A.R. 559).

15

16      Plaintiff's April 3, 2012 hearing testimony, if credible,[11]
17  suggested that a significant deterioration in Plaintiff's daily
18  activities and social functioning occurred in 2011 and 2012.
19  Plaintiff testified that she was not able to work because she could
20  not function or deal with people (i.e., people telling her what to do,
21  interacting with people, having deadlines and having to work with
22  people) (A.R. 55-56).  As to household activities, Plaintiff said that
23  her husband "does it all" (A.R. 58).

24

25      Given the ALJ's failure to develop the record fully concerning
26  the duration and nature of Dr. Swanson's treatment and the bases for

27  _____

28      [11]   The Court recognizes that the ALJ deemed Plaintiff's
    testimony "less than fully credible" (A.R. 29).

1  Dr. Swanson's opinions, the Court is unable to conclude that the

2  inconsistencies between Plaintiff's _earlier_ reported activities of

3  daily living and social functioning and Dr. Swanson's later opinions

4  furnish a legitimate reason for rejecting Dr. Swanson's opinions.

5  Significantly, many if not most mental impairments are progressive in

6  nature.  See Blankenship v. Bowen, 874 F.2d 1116, 1121-22 (6th Cir.

7  1989), cited with approval in Morgan v. Sullivan, 945 F.2d 1079, 1082-

8  83 (9th Cir. 1991).

9

10      The Court is unable to deem the ALJ's errors to have been

11  harmless.  See Garcia v. Commissioner, 2014 WL 4694798, at *6-7;

12  McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011); Tommassetti v.

13  Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).  Because the

14  circumstances of this case suggest that further administrative review

15  could remedy the ALJ's errors, remand is appropriate.  McLeod v.

16  Astrue, 640 F.3d at 888; see generally INS v. Ventura, 537 U.S. 12, 16

17  (2002) (upon reversal of an administrative determination, the proper

18  course is remand for additional agency investigation or explanation,

19  except in rare circumstances).[12]

20  ///

21  ///

22  _____

23      [12]   There are outstanding issues that must be resolved
    before a proper disability determination can be made in the
24  present case.  For example, it is not clear whether the ALJ would
    be required to find Plaintiff disabled for the entire claimed
25  period of disability even if Dr. Swanson's opinions were fully
    credited.  See Luna v. Astrue, 623 F.3d 1032, 1035 (9th Cir.
26  2010).  For at least this reason, the Ninth Circuit's decision in
    Harman v. Apfel, 211 F.3d 1172 (9th Cir.), cert. denied, 531 U.S.
27  1038 (2000), does not compel a reversal for the immediate payment
    of benefits.
28

**CONCLUSION**

For all of the foregoing reasons,[13] Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: October 1, 2014.

_____/S/_____
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

---

[13] The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time. "[E]valuation of the record as a whole creates serious doubt that [Plaintiff] is in fact disabled." See Garrison v. Colvin, 759 F.3d 995, 1021 (9th Cir. 2014).